FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

98 MAR 12 PM 3:39

U.S. DISTRICT COURT
N.D. OF ALABAMA

ANDREW W. KIM,

 Plaintiff

 vs.

THE BOARD OF TRUSTEES OF THE
UNIVERSITY OF ALABAMA, for
its division, the UNIVERSITY
OF ALABAMA SCHOOL OF
MEDICINE, HAROLD J. FALLON,
M.D., and KATHLEEN G. NELSON,
M.D.,

 Defendants

}
}
}
}
}
}
}
}
}
}
}
}
}
}
}
}
}

CIVIL ACTION NO.

CV-96-AR-2797-S

ENTERED

MAR 12 1998

### MEMORANDUM OPINION

Presently before the court is a motion for summary judgment made by the defendants, The Board of Trustees of the University of Alabama for its division, the University of Alabama School of Medicine ("UASOM" or "UAB"), Harold J. Fallon, M.D. ("Fallon"), and Kathleen G. Nelson, M.D. ("Nelson"). Plaintiff Andrew W. Kim ("Kim") sues the defendants alleging that they expelled him from the medical school in violation of his Fourteenth Amendment right to due process, and his right to be free from both racial discrimination, 42 U.S.C. §§ 1981, 1983, and disability discrimination, 42 U.S.C. § 12101. Because there is no dispute as to any genuine issues of material fact, summary judgment for defendants is appropriate.

1

## I. FACTS[1]

Andrew Kim is a Korean born naturalized citizen who attended the University of Alabama Medical School.  Kim enrolled in July 1991 and performed satisfactorily.  By the spring of 1992, however, Kim sought counseling for depression which had been precipitated by his brother's death.  On May 18, 1993, Kim requested, and was granted, a leave of absence from UAB.  The leave of absence was effective from April 16, 1993 through January 1994.  While on leave, the wife of the deceased brother committed suicide, but Kim returned to UAB in January 1994 and finished his second year.

In order to advance to the third year of medical school at UAB, and most American medical schools, a medical student must pass Part One of the United States Medical Licensing Examination ("USMLE").  This examination is offered yearly, in June and in September.

After returning from his leave of absence, in January 1994, and completing his second year, Kim felt unprepared for the June 1994 USMLE.  Def.'s Ex. 13 ("I did not take the USMLE, Step 1.

---

[1]   The facts are presented in the light most favorable to the plaintiff. *Swint v. City of Wadley*, 51 F.3d 988, 995 (11th Cir. 1995).  The court notes, however, that neither party bothered to support its summary of facts with citations to the record.

Perhaps I did not give it my best effort or studied at too slow pace [sic].  On the day before the exam I still felt that I would not be successful on the first attempt.  I apologize for my action and hope that I did not violate school rules.").  Therefore he notified the appropriate medical school official and indicated that he would try to take the September 1994 examination.  Because of his depression, however, he was unable to take the September 1994 examination.

In early October, Associate Dean C. W. Scott, Jr. ("Scott"), informed Kim by letter that his failure to take the two 1994 examinations would be considered a withdrawal from the medical school, unless Kim contacted Scott by a specified date with an acceptable explanation.  Def.'s Ex. 2.  Kim met with Scott in a timely manner and explained his family problems.  Scott granted Kim a second leave of absence which was retroactive to June 1994 and continued until June 1995.  Def.'s Ex. 3.  <u>Scott emphasized, however, that Kim was expected to take the June 1995 USMLE</u>.  *Id.*

On May 30, 1995, Kim sent a letter to UAB indicating that he would not be able to return to Birmingham in sufficient time to study for the June examination, but that he would sit for the test in September.  Def.'s Ex. 4.  The letter did not arrive until June 16, 1995.  At this point, Kim had failed to sit for

the USMLE on three occasions since returning from his second leave of absence: June 1994, September 1994, and June 1995. The UASOM student handbook provides that a second year student has three opportunities to pass the examination. Def.'s Ex. 1, at p. 64. When Kim returned to campus after missing the June 1995 examination, he met with defendant, Kathleen G. Nelson ("Nelson"), who was the new Associate Dean, replacing Dr. Scott. Nelson insisted that Kim register for the September USMLE. Nelson also sent Kim a letter indicating that the September 1995 setting would be his last opportunity to take the exam. Def.'s Ex. 5. Kim insists, however, that he did not receive this letter.

Although Kim registered for the examination, he did not take the September USMLE. Instead he requested permission to repeat his second year of school. Kim believed this would more adequately prepare him for the June 1996 examination. Nelson granted his request and allowed Kim to re-take a course and audit several additional courses.

During the academic year, however, he became romantically involved with a woman who threatened him after the relationship ended. The woman and her mother carried through with these threats by fabricating a story and sharing it with medical school

4

personnel.  The women claimed that Kim had kidnaped the former girlfriend and committed other sordid acts.  As a result of these allegations Nelson met with Kim and advised him to stay way from the women.  Kim then filed charges against the women with the Birmingham police department.  He shared a copy of this report with Nelson who subsequently shared the report with defendant, Dr. Fallon, and an instructor in the undergraduate department where the former girlfriend was enrolled.  The undergraduate instructor discussed the report with the former girlfriend and the threats from the woman increased.  Eventually, Kim complained to UAB police about the women and the harassment stopped.

As a result of these events, Kim was unprepared for the June 1996 USMLE.  "Knowing that the student catalogue provided three chances to take the USMLE examinations, he contacted the National Board on June 8, 1996, that he was withdrawing from the June exam."  Pl.'s Br. at p. 4.  Because he was embarrassed, Kim did not inform Nelson of his failure to sit for the examination. Nine days after he notified the National Board, Nelson sent a letter to Kim terminating him as a medical student for failing to take the USMLE.  Def.'s Ex. 7.  This was the fifth examination that Kim missed.

Kim immediately requested reinstatement and/or an

5

opportunity to appeal Nelson's decision.  Nelson initially denied
Kim's request and refused to allow Kim to obtain a copy of his
medical school records.  Nelson also suggested, on more than one
occasion, that Kim attempt to transfer to a medical school in
Korea or one of the historically African-American medical
schools, such as Meharry or Morehouse.  Kim testified that Nelson
often used the phrase, "the three M's, Meharry, Morehouse, and
minority."  Kim Dep., at 115.  Kim also alleges that Nelson
described him as too polite and too passive.  *Id.* at 115.
Finally Nelson stated that Kim would not make a good medical
doctor and that he needed further psychiatric help to overcome
his depression.  *Id.* at 117.

Following the academic dismissal appeal procedures found in
the student handbook, Kim filed a formal notice of appeal in
which he requested a hearing before the Associate Dean for
Undergraduate Medical Education, Dr. Boulware.  UAB denied Kim's
request, but did permit Kim to meet first with Dr. Nelson and
later with Dean Fallon.  In his brief, filed in opposition to
UASOM's motion for summary judgment, Kim contends that Fallon did
not allow Kim to rebut any information Nelson may have provided.
In his deposition, however, Kim admitted that he believed Fallon
had listened to what Kim had to say about the circumstances
surrounding his failure to sit for the USMLE.  Kim Dep., at 101.

6

On July 5, 1996, Fallon denied Kim's request for reinstatement.
Kim filed the present lawsuit on October 24, 1996.

## II. SUMMARY JUDGMENT STANDARD

Under the Federal Rules of Civil Procedure, summary judgment
is appropriate where "there is no genuine issue as to any
material fact and...the moving party is entitled to a judgment as
a matter of law."  F.R.Civ.P. 56(c).

## III. § 1981 & § 1983 CLAIMS ASSERTED AGAINST STATE ENTITY UASOM

Defendant UASOM first asserts that, pursuant to the Eleventh
Amendment of the Constitution of the United States, it is immune
from Kim's § 1981 and § 1983 claims.  UASOM's assertion is
correct.  The Eleventh Circuit has unequivocally held that state
entities are immune from both § 1981 and § 1983 suits.  *Harden v.
Adams*, 760 F.2d 1158, 1163 (11th Cir. 1985) (discussing Section
1983); *Sessions v. Rusk State Hospital*, 648 F.2d 1066, 1068 (5th
Cir. 1981) (discussing Section 1981).  Similarly there is no
doubt that Alabama state universities are entities for purposes
of Eleventh Amendment immunity.  *Harden*, 760 F.2d at 1163.
Consequently, UASOM is entitled to summary judgment on Kim's §
1981 and § 1983 claims.

If UASOM did not enjoy absolute immunity, it would not be liable for the reasons which follow in analyzing the § 1981 and § 1983 claims against the individual defendants.

## IV. § 1981 & § 1983 RACE DISCRIMINATION CLAIMS ASSERTED AGAINST THE INDIVIDUAL DEFENDANTS

Kim argues that the issue of whether his expulsion was motivated by racial animus constitutes "a fact which should be decided by a jury." Pl's. Br. at 7. In support of this argument he points to Nelson's comment regarding transfer to a Korean medical school or one of the "three M's, Meharry, Morehouse and minority." Kim Dep., at 115, 117. Kim also claims that Nelson's description of him, as too polite and too passive, was racially derogatory. *Id.* Finally, Kim asserts, via his own affidavit, that discriminatory remarks by Nelson also precipitated the expulsion of another Korean medical student. Kim Aff. (Doc 19), at ¶5. Beyond this, Kim produces no other evidence to support his § 1981 and § 1983 claims.

Kim may make out his primae facie case for disparate treatment: (1) by producing direct evidence of discrimination, (2) by meeting the McDonnell Douglass circumstantial evidence framework, or (3) by demonstrating a pattern of discrimination

8

using statistical data.[2]  *Earley v. Champion Int'l Corp.*, 907
F.2d 1077, 1081 (11th Cir. 1990).

## A. Direct Evidence

Presumably, Kim contends that Nelson's comments constitute
direct evidence and therefore he has made out a prima facie case
of racial discrimination.  Direct evidence is "evidence, which if
believed, proves the existence of the fact in issue <u>without</u>
<u>inference or presumption</u>."  *Carter v. Three Springs Residential
Treatment*, 132 F.3d. 635, 641 (11th Cir. 1998) (citations omitted
& emphasis supplied).  Consistent with this definition, any
statements that Kim seeks to introduce as direct evidence must
directly relate to Nelson's decision to dismiss him.  *See id.* at
642.  If Kim cannot show such a connection, between the comments
and the dismissal, this court can only consider the comments as
indirect evidence.  *See Burrell v. Board of Trustees of Georgia
Military College*, 125 F.3d 1390, 1393 (11th Cir. 1997).

Nelson's comments do not constitute direct evidence.
Although such comments are distasteful, there is no evidence that

---

[2] "The Supreme Court has held that the test for intentional
discrimination in suits under § 1981 is the same as the formulation used in
Title VII discriminatory treatment causes."  *Brown v. American Honda Motor
Co., Inc.*, 939 F.2d 946, 949 (11th Cir. 1991), *cert. denied,* 502 U.S. 1058,
112 S. Ct. 935 (1992).  The Title VII paradigm also applies to § 1983 cases
because "[t]he section 1981 claim has been effectively merged into the section
1983 claim for racial discrimination."  *Busby v. City of Orlando*, 931 F.2d
764, 771 (11th Cir. 1991) .

her decision to dismiss Kim was motivated by racial animus.  It
is clear that Kim failed to meet the objective requirements for
continued enrollment in the medical school program; therefore,
this court cannot infer or presume that Nelson was motivated by
racial animus when she expelled Kim.  "Direct evidence, by
definition, is evidence that does not require such an inferential
leap between fact and conclusion."  *Carter*, 132 F.3d at 642.

Moreover, the record indicates that, until Kim failed to sit
for his fifth USMLE, Nelson may have treated Kim more favorably
than other students.  Kim was aware that he was expected to sit
for the June 1995 USMLE after he returned from his second leave
of absence in January 1995.  When he failed to take both the June
and September examinations, Nelson allowed Kim to re-take and/or
audit several classes rather than dismiss him from the program.
However, Kim then failed to sit for the June 1996.  Now he
complains that the same dean who allowed him to remain in the
program for an additional year, despite his failure to sit for
even one examination, held discriminatory attitudes which
affected her decision to dismiss him from the program.

Even if this court were to assume Nelson held racially
discriminatory attitudes, she was not the ultimate decision
maker.  Therefore her statements could not constitute direct

10

evidence.  *See LaMontagne v. American Convenience Products, Inc.,*
750 F.2d 1405, 1412 (7th Cir. 1984)(cited with approval in *Mauter
v. Hardy Corp.*, 825 F.2d 1554, 1558 (11th Cir. 1987)).  Dr.
Fallon, the Dean of the Medical School, ratified Nelson's
decision to dismiss Kim.  There is certainly no evidence in the
record that would even remotely suggest that Dr. Fallon, the
ultimate decision maker, maintained racial animus when he
affirmed Nelson's decision.  Moreover, Fallon only affirmed
Nelson's decision after personally hearing Kim's explanation for
his failure to take the USMLE.  Because Dean Fallon was the
ultimate decision maker with the authority to overrule Nelson's
decision, "the relevant inquiry" is into the motivation of Dr.
Fallon.  *See LaMontagne*, 750 F.2d at 1412.  Therefore, any "chain
of inference" from Nelson's comments to the decision by Dr.
Fallon to uphold the dismissal, "would be sheer speculation."
*See id.*  Consequently, Nelson's comments do not constitute direct
evidence of discrimination.


## B. Indirect Evidence

    Without direct evidence of discrimination, Kim must proceed,
if at all, under the McDonnell Douglas indirect evidence
framework by showing that: (1) he was a member of a protected
group, (2) he was qualified, (3) he suffered adverse action at
the hands of the individual defendants, and (4) he was dismissed

"under circumstances that give rise to an inference of discrimination." See *Gitlitz v. Compagnie Nationale Air France*, 129 F.3d 554, 559 (11th Cir. 1997). If Kim can make out a prima facie case under the McDonnell Douglas framework, then the burden of production (not the burden of persuasion) shifts to UASOM to come forward with a legitimate non-discriminatory reason for the dismissal. *See Trotter v. Board of Trustees of University of Alabama*, 91 F.3d 1449, 1454 - 55 (11th Cir. 1996). If UASOM can supply such a reason, the burden shifts back to Kim to produce admissible evidence from which a jury might find that UASOM's proffered reason is pretextual. *See id.*

Kim is unable to make out a prima facie case under the McDonnell Douglass indirect evidence framework because he cannot show that he was qualified to remain in the program. Continued enrollment, beyond the second year of the program, requires a passing score on the USMLE. The student handbook provides, however, that the student has three opportunities to obtain a passing score. Kim failed to obtain a passing score after <u>five</u> examinations: two 1994 examinations, two 1995 examinations and the June 1996 examination. Even if this court were to overlook his failure to take the two 1994 examinations, because he was granted a retroactive leave of absence for that time period, Kim still was allowed three additional examination opportunities to

pass without even sitting for the USMLE.  Because he failed to meet the requirements for continued enrollment, he is not "qualified" and cannot make out a prima facie for discrimination. His personal and emotional problems do not alleviate his duty, pursuant to the McDonnell Douglass paradigm, to establish that he was qualified to remain in the program.

Even if Kim could make out a prima face case, his race discrimination claims fail because he is unable to produce any evidence from which a jury might find that UASOM's proffered non-discriminatory reason for the dismissal is pre-textual.  Kim cannot create pre-text out of thin air by citing his own affidavit regarding the alleged discriminatory treatment of another Asian UASOM student.  In the affidavit, Kim affirmed that he spoke with the mother of the other Asian student.  Kim Aff. (Doc. 19), at ¶5.  Apparently, the mother told Kim that UASOM dismissed her son in his fourth year of medical school and that Nelson had made disparaging remarks to the son regarding Asians. *Id.*  This double hearsay is inadmissable.  Fed. R. Evid. 801.

Even if such evidence were admissible, the mother's conclusory allegation, that UASOM dismissed her son because of his race, is not enough to support a finding of pretext. Consequently, summary judgment is appropriate for the individual

13

defendants on Kim's § 1981 and § 1983 race discrimination claims.

## VI. FOURTEENTH AMENDMENT DUE PROCESS CLAIMS

Kim is unable to complain that UASOM violated his due process rights by refusing to allow him an opportunity to be heard, as required under the Due Process clause of the Fourteenth Amendment to the United States Constitution.  He does not dispute that Dr. Nelson, the Associate Dean of Students heard his first appeal.  Kim Dep., at 98.  Nor does Kim dispute that Dr. Fallon, the Dean of the Medical School, then heard Kim's second appeal. Kim Dep., at 99 - 101.

Rather than the inability to be heard, Kim complains that UASOM violated his procedural due process rights when it prevented him from utilizing the appeal process available to other students.  Specifically, Kim complains that UASOM denied him an opportunity to take advantage of the appeal procedure described in the student handbook as well as the actual appeal procedure UASOM utilizes, but never memorialized.

The student handbook provides that a student who is dismissed from the medical school or suffers adverse action by the promotions committee, may appeal the committee's action by

14

filing a timely notice of his intent to appeal.  Student
Handbook, Def's. Ex. 1, at p. 63.  First and second year students
"appeal first to the Associate Dean for Undergraduate Medical
Education of the School of Medicine," in this instance Dr.
Boulware.  *Id.* at p. 64.  If the Associate Dean denies the
appeal, the student may then appeal to the Dean of the School of
Medicine, Dr. Fallon.  *Id.*  "The decision of the Dean will be
final.  No further appeal is offered by the School of Medicine.
Academic appeal hearings are not legal proceedings. They
constitutes an <u>opportunity for the student to be heard</u> by an
academic administrative official of the School of Medicine."  *Id.*
(emphasis supplied).

However, Dr. Nelson testified that UASOM actually uses an
appeal procedure that differs from the one described in the
student handbook.  A three person panel, not solely Dr. Boulware,
hears a student's first appeal in academic dismissal cases.
Nelson Dep., at 103 - 106.  However, Nelson did not utilize an
appeal panel in Kim's case for two reasons.  First, both Nelson
and the promotions committee (which certifies each student to
progress to the next level of the program) agreed that Kim's
expulsion was "administrative," rather than "academic."   Nelson
Dep., at 113 - 14.  Second, Nelson, not the promotions committee,
made the initial decision to dismiss Kim.  The appeal panel,

according to Nelson, is only available for "academic" dismissals that are carried out by the promotions committee. *Id.*

"To be entitled to the procedural protections of the Fourteenth Amendment, [Kim must first] demonstrate that [his] dismissal from the school deprived [him] of either a 'liberty' or a 'property' interest." *Board of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 82, 98 S. Ct. 948, 951 (1978).  The United States Supreme Court assumes that a liberty or property interest exists in school dismissal cases. *See e.g., Horowitz*, 435 U.S. at 84 -85, 98 S. Ct. at 952.  Therefore, Kim meets the initial hurdle for asserting a due process claim.

Next, Kim must produce evidence that UASOM failed to meet minimum due process standards when it dismissed him.  In the "landmark" case of *Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, *cert. denied*, 368 U.S. 930, 82 S. Ct. 368 (1961), the former Fifth Circuit[3] recognized that students facing expulsion from a tax-supported educational institutions are entitled to the protections of the due process clause. *Gross v. Lopez*, 419 U.S. 565, 576, 95 S. Ct. 729, 737 (1975).  Specifically, such students are entitled to notice and an opportunity to be heard. *Horowitz*,

---

[3] The Eleventh Circuit has adopted as precedent all Fifth Circuit Court of Appeals cases decided prior to October 1, 1981.  <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981).

435 U.S. at 85 - 86, 98 S. Ct. at 952 - 53. (citations omitted).

However, clarified the court, the opportunity to be heard need

only be in the form of an "informal give-and-take." *Id.*


The Fifth Circuit further clarified the due process

standards, by noting that the *Dixon* requirements are limited to

"disciplinary" expulsions. *Mahavongsanan v. Hall*, 529 F.2d 448,

449 (5th Cir. 1976).

> Misconduct and failure to attain a standard of
> scholarship cannot be equated.  A hearing may be
> required to determine charges of misconduct, but a
> hearing may be useless or harmful in finding out the
> truth concerning scholarship. There is a clear
> dichotomy between a student's due process rights in
> disciplinary dismissals and in academic dismissals.

*Id.* at 450.


In *University of Missouri v. Horowitz*, the United States

Supreme court ratified the Fifth Circuit's analysis by

recognizing that there is a "significant difference between the

failure of a student to meet academic standards and the violation

by a student of valid rules of conduct.  This difference calls

for far less stringent procedural requirements in the case of an

academic dismissal."  435 U.S. at 86, 98 S. Ct. at 953.

Accordingly, concluded the Supreme Court, "a hearing is not

required by the Due Process Clause of the Fourteenth Amendment."

*Id.* at 86 n.3, 98 S. Ct. at 953 n.3.  Due process merely requires that school officials engage in a "careful and deliberate" "decision-making process" before expelling a student for <u>academic</u> reasons.  *Haberle v. University of Alabama in Birmingham*, 803 F.2d 1536, 1539 (11th Cir. 1986)(citing *Horowitz*, 435 U.S. at 85, 98 S. Ct. at 952)).

     Applying the "careful and deliberate" test, Kim's procedural due process claim cannot survive summary judgment.  He has produced no evidence which would indicate that UASOM's decision to expel him was reached without care and deliberation.  Although Nelson alone made the original dismissal decision, the promotions committee not only ratified her decision, but also agreed that Kim's dismissal was not academic and therefore he was not entitled to utilize the three person panel.  Nelson Dep., at 113 - 14.  UASOM then allowed Kim two opportunities to be heard.  Kim first appealed to Dr. Nelson and then to Dr. Fallon, the Dean of the medical school.  Nelson Dep., at 115.  Finally, all of the decision makers were aware of Kim's personal and medical school history.  *See id.*

     Thus, not only did UASOM met the constitutionally mandated procedural due process requirements for academic dismissals, by making a careful and deliberate decision, but UASOM also met the

18

due process requirements for disciplinary dismissals, by allowing Kim an opportunity to be heard.  Indeed, UASOM exceed the minimum requirements of due process by allowing Kim _two_ opportunities to be heard.  Whether or not UASOM followed is normal appeal procedures is irrelevant for purposes of _procedural_ due process. "The fact that the procedures used were ad hoc does not violate the Horowitz standard; no formal hearing is required."  _Haberle,_ 803 F.2d at 1539.

Nonetheless, UASOM's failure to follow its standard appeal procedures is not wholly irrelevant.  Failing to follow established dismissal procedures does subject the decision maker to a _substantive_ due process challenge.  Such challenges, however, only provide a "narrow avenue for judicial review." _Regents of the Univ. of Michigan v. Ewing_, 474 U.S. 214, 227, 106 S. Ct. 507, 514 (1985).

> When judges are asked to review the substance of a genuinely academic decision, such as this one, they should show great respect for the faculty's professional judgment.  Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment.

_Haberle_, 803 F.2d at 1539 (emphasis supplied)(citing _Ewing_, 474 U.S. 214, 106 S. Ct. 507).

This narrow avenue for judicial review was utilized in *University of Michigan v. Ewing*, where the defendant medical school dismissed the plaintiff, a second year medical student, after he experienced academic difficulties and failed to obtain an acceptable score on his national board examination. 474 U.S. 214, 106 S. Ct. 507. Because Ewing, like Kim, could only advance to his third year if he obtained a satisfactory score on the national board test, the University expelled him after he scored the lowest in the program's history. When the University refused to allow him to retake the examination, Ewing sued, contending, *inter alia*, that his due process rights were violated because the medical school denied him the procedure available to other students: namely, the opportunity to re-take the examination. The United States Supreme Court found that the University did not violate Ewing's substantive due process rights by refusing his request to re-take the examination. "[W]hen viewed against the backdrop of his <u>entire career</u> at the University...," the Supreme court found that Ewing's dismissal "rested on academic judgment that [was] not beyond the pale of reasoned academic decision-making." *Ewing*, 414 U.S. at 227 - 28, 106 S. Ct. at 514 - 15. Therefore, the university's departure from its normal procedure of allowing retakes was not fatal. *See id.* Further, noted the court, there was no evidence that the facts of Ewing's case made him similarly situated to those students who had been allowed to

20

re-take the national board examination.  *Id.* at 228 n.14, 106 S.
Ct. at 515 n.14.  Consequently, Ewing's termination did not
"substantially deviate from accepted academic norms when compared
with [the defendants'] treatment of other students."  *Id.*

Given the circumstances in the case presently before the
court, UASOM's decision, like the decision in *Ewing*, was not
"beyond the pale of reasoned academic decision-making."  *See id.*
at 227 - 28, 106 S. Ct. at 514 - 15.  Kim had five opportunities
to take the national board exam (two more opportunities than
other students), but he had failed to sit for a single exam.  Kim
was well aware that continued enrollment in the program was
conditioned upon a passing examination score and that UASOM
required its medial school students to obtain a passing score
within three examinations.  Kim did not take the examination
within the required time frame.  "Therefore, he is not entitled
to continue to pursue the [degree].  There is nothing arbitrary
about such a requirement."  *Haberle*, 803 F.2d at 1541.  While
UASOM had been very understanding of Kim's personal crises in the
past, it was under no obligation to further excuse him from the
program requirements.

Moreover, like Ewing, Kim cannot produce evidence that there
were other similarly situated students who were treated more

21

favorably.  Consequently, this court has no comparators against
which to evaluate UASOM's decision.  Without such comparators and
given Kim's repeated failure to meet UASOM's requirements for
continued enrollment, Kim cannot show that UASOM's decision was
arbitrary or that the medical school failed to exercise
"professional judgment."  *See Haberle*, 803 F.2d at 1539.  Thus
summary judgment for the defendants will be granted on Kim's
procedural and substantive due process claims.


### VI. AMERICANS WITH DISABILITIES ACT ("ADA") CLAIMS
### A. ADA Claims Asserted Against The Individual Defendants

Both Dr. Nelson and Dr. Fallon correctly assert that they
are improper defendants inasmuch as Kim asserts ADA claims
against them in their individual or official capacities.  The ADA
"does not provide for individual liability, only for employer
liability."  *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir.
1996).  Therefore, the court will grant summary judgment to
Nelson and Fallon on Kim's ADA claim.


### B. ADA Claims Asserted Against UASOM

When the current motion for summary judgment came under
submission, UASOM did not have the benefit of this court's
January 13, 1998, opinion in *Garrett v. Board of Trustees of the
Univ. of Alabama in Birmingham*, CV-97-AR-0092-S.  Accordingly,

22

UASOM did not raise an Eleventh Amendment Immunity defense in
response to Kim's ADA claim.  Consistent with the *Garrett*
decision, the court holds that UASOM is immune from suit under
the ADA and is therefore entitled to summary judgment on said
claim.

Even if UASOM were not entitled to Eleventh Amendment
immunity, Kim's ADA claim could not survive.  To establish a
prima facie case for disability discrimination Kim must show
that: (1) he has a disability;[4] (2) he is a qualified individual;
and (3) he was subjected to unlawful discrimination because of
his disability.  *Holbrook v. City of Alpharetta*, 112 F.3d 1522,
1526 (11th Cir. 1997)(citations omitted).  A qualified individual
with a disability is one who can "perform the essential functions
as a [UAB] medical student despite his disability or with a
reasonable accommodation for his disability."  *Ellis v. Morehouse
School of Medicine*, 925 F. Supp. 1529, 1540 (N.D. Ga. 1996).

Kim is unable to make out a prima facie case for disability
discrimination because he cannot show that he is a qualified

---

[4] The ADA defines a disability as: "a) a physical or mental impairment
that substantially limits one or more of the major life activities of such
individual; B) a record of such impairment; or C) being regarded as having
such an impairment." 42 U.S.C. § 12101(2).  Kim asserts that he is disabled
for purposes of the ADA because UASOM regarded him as a having an impairment.
Although UASOM contends that Kim does not meet any ADA definition of
disability, the court assumes that Kim is disabled for purposes of this motion
for summary judgment.

individual with a disability.  As discussed in this court's analysis of his race discrimination claim, Kim failed to meet the objective criteria for continued enrollment in the medical school, by failing to obtain a passing core on the USMLE within the requisite number of examinations.  Consequently, Kim is not qualified to remain in the program and therefore cannot make out a prima facie case for disability discrimination.

Second, Kim's prima facie case fails because he is unable to produce evidence that his dismissal was based upon his disability.  Nelson's comments regarding Kim needing psychiatric help do not establish improper motive.  There is no evidence which might even remotely suggest that an improper motive entered into the ultimate decision made by Dean Fallon to affirm Kim's dismissal.  Kim simply did not meet the program requirements.

Finally, even if Kim could make out a prima facie case of disability discrimination he still could not survive summary judgment.  Although UASOM had a duty to provide reasonable accommodations that would have enabled Kim to meet the requirements of the program, the court determines, as a matter of law, that UASOM fulfilled this duty. "[T]he point is not whether a medical school is 'right' or 'wrong' in making  program-related decisions." *Wynne v. Tufts Univ. School of Medicine*, No. Civ.A.

24

88-1105-Z, 1992 WL 46077 (D. Mass. 1992), *aff'd*, 976 F.2d 791, 795 (1st. Cir. 1992), *cert. denied*, 507 U.S. 1030, 113 S. Ct. 1845 (1993).  This court can only review the expulsion "to determine if [Kim] presents evidence that [UASOM's] decision to dismiss him was so arbitrary or irrational as to not constitute an exercise of professional judgment." *See Ellis*, 925 F. Supp. at 1543, 1541 - 2 (applying the deferential due process standard in academic dismissal cases where the plaintiff alleges discrimination). "That [UASOM] could have provided a different set of reasonable accommodations or more accommodations does not establish that the accommodations provided were unreasonable or that the additional accommodations were necessary." *Wynne*, 1992 WL 46077, at *1.

There is nothing in the record to suggest that UASOM's dismissal of Kim was "so arbitrary or irrational as to not constitute an exercise of professional judgment." *See Ellis*, 925 F. Supp. at 1543.  UASOM more than reasonably accommodated Kim's disability for several years.  It granted Kim a retro-active leave of absence, excused Kim's failure to sit for the two 1994 examinations and allowed him three more opportunities to take the USMLE.  However, Kim exhausted his three additional opportunities without even sitting for the examination.  UASOM was under no

25

duty to further excuse him from the essential requirements of the program. *See id.* at 1547 (noting that the defendant "is only required to accommodate [the plaintiff] to the extent that such accommodation would not fundamentally alter the nature of its program") (citing *Southeastern Community College v. Davis*, 442 U.S. 397, 409, 99 S. Ct. 2361, 2368 - 69 (1979)).  Therefore, like his other claims, his ADA claim also fails.


### VII. Conclusion

Because no genuine issues of material fact are in dispute, the defendants are entitled to summary judgment on all claims asserted by Kim.


DONE this __12__ day of March, 1998.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE